# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

PATRICIA K.,

                                        Plaintiff,

      v.                                                   5:20-CV-37
                                                              (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

ELIZABETH V. KRUPAR , Legal Aid Soc. of Mid-NY, Inc. for Plaintiff
TIMOTHY SEAN BOLEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.   **PROCEDURAL HISTORY**

Plaintiff protectively filed her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on November 7, 2016, alleging that she became disabled on September 1, 2008.[1] (Administrative Transcript ("T") 10, 29, 74-75, 141-50).  Plaintiff's claim was denied initially on December 22, 2016 . (T. 76-83).  Plaintiff made a timely request for a hearing, which was held on September 26, 2018 before Administrative Law Judge ("ALJ") Kenneth Theurer. (T. 25-60).  Plaintiff appeared with her representative and testified at the hearing. (*Id.*)  The ALJ also heard

---

[1] For purposes of DIB, plaintiff's "Date Last Insured" was December 31, 2010. (T. 28).

testimony from Vocational Expert ("VE") Joseph Atkinson[2] (T. 54-59) and plaintiff's brother (T. 49-54). ALJ Theurer issued an unfavorable decision on November 13, 2018. (T. 10-19). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on December 2, 2019. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that he is not only unable to do his previous work but  cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

First, the [Commissioner] considers whether the claimant is currently

---

[2] The VE testified by telephone.

engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff was born on July 24, 1969 and was 49 years old at the time of the ALJ's hearing.  Plaintiff lived in a home with her three children, ages 27, 16, and 14. (T. 33). Plaintiff has a Liberal Arts Associates Degree from Morrisville College.[3] (T. 33). Plaintiff had various jobs between 2003 and the time of the hearing, none of which amounted to substantial gainful activity for purposes of previous work. (T. 34-37).

---

[3] Plaintiff later testified that she had extra help when she was in school, including getting extra time for tests, even when she attended Morrisville College for her Associate's Degree. (T. 47).

4

Plaintiff testified that she was unable to work due to "anxiety and depression," which has also been diagnosed as "schizoaffective disorder." (T. 38). Plaintiff testified that she took a variety of medications, but that her children help her "organize" her pills because plaintiff had trouble remembering to take them. (T. 39-40, 43). Plaintiff had some in-patient hospitalizations for her mental illness: in 2011, in 2016, and the last in 2018, only a few months prior to the ALJ's hearing. (T. 40-42). She testified that there were "different causes" for her hospitalization. (T. 43-44).

Plaintiff testified that her typical day, included getting up, doing some household chores, and walking her dog. (T. 44). Plaintiff states that, although she got "confusion" and lacked concentration and focus, she could cook and follow a recipe. (T. 44). Plaintiff testified that she read non-fiction books, but sometimes had trouble following the book. (T. 45). Plaintiff worked briefly as a cashier in a craft store. (T. 45). Plaintiff stated that she would be unable to work because she could not stay "focused on the task at hand" and could not "focus on the customer." (T. 45-46). She stated that the "stress levels" affected her, but had no trouble operating the cash registers because they "pretty much told you what you had to . . . know . . . ." (T. 46).

Plaintiff's brother testified that he tried "to keep tabs" on plaintiff and her children, made sure their house was "functional," the bills were paid, and helped to maintain a "stable environment" for plaintiff and her children. (T. 50). He testified that he saw the plaintiff once or more per week, "depending," and he took over the finances after a recent text message from plaintiff's daughter stating that plaintiff had spent a

great deal of money on things that the family did not need.[4] (T. 51-52).  He testified that

he and his brothers were concerned that plaintiff would not pay the bills or would spend

money irresponsibly, and therefore, took over those responsibilities. (*Id.*)  Plaintiff's

brother also testified that plaintiff's children have "stepped up" to take care of the

plaintiff "to help preserve a stable environment" because the "confusion level" that the

plaintiff displayed was "concerning."[5] (T. 53).  However, plaintiff's brother also

testified that, when plaintiff was working in 2017 and taking care of her sick mother, he

was not aware of any issues with plaintiff's attendance or any other issues she had at

work. (T. 53-54).

The ALJ asked the VE one basic hypothetical question, and then discussed

additional restrictions. (T. 55-65).  The basic question assumed an individual with the

same age, education, and work history as the plaintiff. (T. 55).  The ALJ then asked the

VE to assume that the individual retained the ability to understand and follow simple

instructions and directions, could perform simple tasks independently with supervision,

could regularly attend to a routine and maintain a schedule, could relate to and interact

with others to the extent necessary to carry out simple tasks,[6] but would have to avoid

---

[4] This occurred shortly before the plaintiff's most recent hospitalization. (T. 51).

[5] Plaintiff's brother testified that when plaintiff woke up in the morning she was "confused" and a "little bit disconnected," and it took a couple of hours in the morning for her to "get up to speed." (T. 53).

[6] There appears to be an error in the transcript.  The hypothetical question reads as follows: "could relate to and interact with others, *to accept necessary care out of simple tasks* . . . ." (T. 56) (emphasis added).  That sentence does not make sense.  The ALJ's RFC, contained in his decision reads as I have written above.  It is clear that the transcription of the ALJ's question to the VE was in error.

work requiring any more complex interaction or joint effort to achieve a work goal. (T. 56).  Finally, plaintiff could make an occasional simple decision, directly related to the completion of her task, in a stable, unchanging work environment. (*Id.*)

Based on the above hypothetical question, the VE stated that there was no previous work that such an individual could perform, but she could perform the jobs of laundry worker, kitchen helper, and mail clerk. (T. 56).  However, if the plaintiff could only maintain a routine or follow a schedule "frequently,"[7] she would be unable to perform any work. (T. 56).  The VE testified that an employer would only tolerate an individual being "off task" approximately 10% of the time, and if an individual is only on task "frequently," that means that she would be "off task" 33% of the time and would not be able to maintain employment of any kind. (*Id.*)  The same would be true for the ability to maintain attention and follow instructions. (T. 56-57).  Finally, an employer would tolerate only one unscheduled absence per month. (T. 57).

The VE did explain that if an individual were to be reliable for most of the year and then were "gone for three weeks," it would not preclude full-time employment because such an absence would be treated as "a short-term disability situation." (T. 57). This type of absence would only begin to cause a problem if it happened more than twice per year or "on a repeated basis." (T. 57-58).

The parties' papers provide a detailed statement of the medical and other evidence of record.  Rather than recite this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff, with

---

[7] The VE testified that the Dictionary of Occupational Titles defines "frequently" as one third to two thirds of the time. (T. 57).

any differences as noted.

## IV.  **THE ALJ'S DECISION**

After finding that plaintiff had not engaged in substantial gainful activity

("SGA") since the date of her alleged onset in 2008, the ALJ found the following

severe impairments at step two of the sequential evaluation: Bipolar Disorder, Anxiety

Disorder, Depressive Disorder, and Schizoaffective Disorder. (T. 13).  At step three of

the sequential evaluation, the ALJ found that none of plaintiff's severe impairments,

either singly, or in combination meet or medically equal the severity of a Listed

Impairment. (*Id.*)  In making this determination, the ALJ reviewed Listings 12.03

(Schizophrenia, spectrum and other psychotic disorders), 12.04 (Depressive, bipolar,

and related disorders), and 12.06 (Anxiety and obsessive compulsive disorders). (*Id.*)

The ALJ found that because plaintiff's mental impairments did not cause at least two

"marked" limitations or one "extreme" limitation in the four broad areas of functioning,

she did not satisfy the "B" criteria of the listings. (T. 13-14).

The ALJ also determined that plaintiff failed to meet the "C" criteria of the

Listings. (T. 14-15).  In doing so, the ALJ disagreed with consulting medical expert, Dr.

Michael Lace, Psy.D., who opined in response to the ALJ's interrogatories, that

plaintiff had only "marginal adjustment." (T. 14-15).  The ALJ proceeded to the fourth

step of the sequential evaluation and found that plaintiff had the RFC to perform work

at all exertional levels. (T. 15).  Mentally, the ALJ found that plaintiff retained the

ability to understand and follow simple instructions and directions, could perform

simple tasks independently with supervision, could regularly attend to a routine and

maintain a schedule, could relate to and interact with others to the extent necessary to carry out simple tasks, but would have to avoid work requiring any more complex interaction or joint effort to achieve a work goal. (T. 15). Plaintiff could make an occasional simple decision, directly related to the completion of her task, in a stable, unchanging work environment. (*Id.*)

In making this determination, the ALJ noted that he was considering plaintiff's symptoms, the medical records, and her daily activities. (T. 15-17). The ALJ weighed the medical evidence and specifically noted the weight that he was giving the doctors' opinions. (*Id.*) The ALJ also considered plaintiff's brother's testimony, finding that while he might be familiar with plaintiff's day-to-day functioning, there was the "potential for bias." (T. 17). His testimony was considered to the extent that it was "consistent" with the "rest of the record." (*Id.*) Based on the RFC stated above and the VE's testimony at the hearing, the ALJ determined that plaintiff could perform the jobs of laundry worker (medium, unskilled), kitchen helper (medium, unskilled), and mail clerk (light, unskilled). (T. 18). Thus, the ALJ found that plaintiff was not disabled under the regulations.

V.    **ISSUES IN CONTENTION**

Plaintiff raises the following arguments:

(1)    The ALJ failed to develop a full and fair record. (Pl.'s Br. 10-13) (Dkt. No. 9).

(2)    The ALJ failed to properly weigh the medical evidence, particularly Dr. Lace's opinion, rendering the Listing Analysis and the RFC invalid. (Pl.'s Br. at 13-18).

(3)    The ALJ erred in his analysis of plaintiff's subjective symptoms. (Pl.'s Br.

at 18-20).

(4)     The ALJ erred in relying on the VE's testimony due to unexplained conflicts between the VE's testimony and the DOT. (Pl.'s Br. at 20-23).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed.  (Defendant's Brief ("Def.'s Br.") at 6-19) (Dkt. No. 10).  For the following reasons, this court agrees with defendant and will affirm the Commissioner's determination.

## DISCUSSION

### VI.   RFC EVALUATION/DUTY TO DEVELOP RECORD

#### A.   Legal Standards

##### 1.   Duty to Develop the Record

Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Martin v. Comm'r of Soc. Sec.*, No. 18-CV-0720MWP, 2020 WL 611015, at *4 (W.D.N.Y. Feb. 10, 2020) (citing *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d 377, 386 (2d Cir. 2004)); 20 C.F.R. §§ 404.1512 (d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.").

Thus, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see*

*Dougherty-Noteboom v. Berryhill*, No. 17-CV-243, 2018 WL 3866671, *7 (W.D.N.Y. 2018) (ALJ's duty to develop the record "is a threshold requirement for the SSA; the ALJ must develop the record prior to assessing whether a claimant is disabled"); *see also Archbald v. Colvin*, No. 14-CV-07569, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and considered' ") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009)).

Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008).  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination.  20 C.F.R. §§ 404.1512(e), 416.912(e).[8]  Although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information.  *Rosa v. Callahan*, 168 F.3d at 79, n.5.

---

[8] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The current regulations apply to plaintiff's case. *See Jimenez v. Astrue*, No. 12 Civ. 3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that even though the regulations were amended to remove the provision requiring the ALJ to recontact a treating physician to resolve an ambiguity in the record, the regulations still "contemplate the ALJ recontacting the treating physicians when 'the additional information needed is directly related to that source's medical opinion'").

### 2.     RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v.*

*Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 3.    Weight of the Evidence

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### 4.     Evaluation of Symptoms

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[9] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical

---

[9] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[10]   If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).   The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.   However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).   "[R]emand is not required where 'the evidence of record allows the

---

[10] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996), which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

## B.  Analysis

### 1.  Development of the Record

Plaintiff argues that this case should be remanded because the ALJ failed to obtain approximately one year's worth of treatment notes from "Circare"[11] beginning in June of 2017.  Prior to transferring her treatment to Circare, plaintiff was treated extensively from 2010 until 2017 at Arise Child and Family Services ("Arise"). (T. 710-889, 1051-53, 1094-97).  Plaintiff was seen by both counselors and psychiatrists at Arise for therapy and medication management, and these reports are part of the administrative record in this action. (*Id.*)  One of the medical source statements ("MSS") in the record is from one of plaintiff's therapists at Arise, Kelly O'Brien, LMSW and is dated March 2, 2017. (T. 1271-76).  On June 8, 2017, Dr. Golam Mohiuddin, M.D., one of plaintiff's psychiatrists at Arise stated that plaintiff told him that "she will go to a different clinic next month for her psychiatric management."[12] (T. 1094).

In the same note, Dr. Mohiuddin also stated that plaintiff "was doing good mentally," but was sad because her elderly mother was diagnosed with cancer. (T. 1094).  Plaintiff was fully oriented, with good eye contact, no psychomotor agitation.

---

[11] Circare is an agency providing a variety of services, including case management services to those diagnosed with mental illness. https://www.cir.care/about.

[12] This is presumably a reference to Circare.

16

(*Id.*)  Her mood was euthymic,[13] and her affect was congruous with her mood.  There was "no form of thought disorder, her thought content appeared to be free of delusions, and she was not reporting any visual or auditory hallucinations. (*Id.*)  There was no suicidal or homicidal ideation, and she had good impulse control during the session. (*Id.*)  Thus, when she transferred to Circare in June of 2017, plaintiff was doing well.

There are references to Circare elsewhere in the transcript, including in the records of plaintiff's most recent hospitalization in July of 2018. (T. 1257).  However, there are no actual records from this agency or its staff.  Plaintiff argues that it was the ALJ's responsibility to notice this fact and obtain the relevant records.  However, plaintiff was represented at the administrative hearing, and her attorney never mentioned that the record was incomplete, nor did he request that the ALJ keep the record open for any additional evidence. (T. 29-30, 59-60).  The ALJ asked plaintiff's counsel at the beginning of the hearing whether the record was complete. (T. 29).  At that time, counsel submitted the MSS written by Social Worker, Kelly O'Brien, and the ALJ admitted it into evidence. (T. 30).  Counsel mentioned that he left the MSS out inadvertently and found it as he was going through the records. (T. 30).  No other records were submitted by plaintiff after the hearing or to the Appeals Council.

An ALJ has taken reasonable steps to complete the medical record when he asks the plaintiff's attorney at a hearing if the medical records are complete, and the attorney answers affirmatively. *James C. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1206 (TWD),

---

[13] Euthymia is defined as (1) a normal, tranquil mental state or mood, and (2) a stable mental state or mood in those affected by bipolar disorder, that is neither manic, nor depressive. https://www.merriam-webster.com/medical/euthymia

2020 WL 6445907, at *9 (N.D.N.Y. Nov. 3, 2020) (citing *Orts v. Astrue*, No. 5:11-CV-0512 (LEK/ESH), 2013 WL 85071, at *3 (N.D.N.Y. Jan. 7, 2013); *Streeter v. Commr of Soc. Sec.*, No. 5:07-CV-858 (FJS), 2011 WL 1576959, at *4 (N.D.N.Y. Apr. 26, 2011) (holding an ALJ had satisfied her duty to develop the record when "the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded affirmatively")).

Plaintiff argues that even though she was represented, the lack of the Circare records creates an "obvious gap" in the evidence, requiring the ALJ to seek further evidence.  This court does not agree.  Plaintiff argues that there is a reasonable possibility that the missing records would have influenced the ALJ's decision.  Since the court has not seen the records, and plaintiff points to no specific information contained in those records, it is difficult to determine whether those records would have influenced the ALJ's decision.

Plaintiff cites *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1998).  However, *Tirado* is not applicable to plaintiff's case since the plaintiff in *Tirado* was attempting to obtain a "sentence six" remand and had proffered new evidence to support the claim. Here plaintiff is speculating that the evidence would have influenced the ALJ's decision, without knowing what is in those records, and the argument is relevant only to whether the ALJ should have filled an "obvious gap" by obtaining existing records.  As the defendant argues, the reports of plaintiff's 2018 hospitalization are in the record and make reference to the Circare notes. (Def.'s Br. at 8-9; T. 1257, 1264).  On July 2,

2018, Dr. Laura Leso, M.D.[14] stated that she spoke to plaintiff's therapist at Circare, who told her that "[w]hen last seen on 6/21/18 she was doing well.  There were stressors of course including the death of her mother 3-18 but she seemed to be tolerating that well." (*Id.*)  Dr. Leso's assessment was that plaintiff had "an abrupt change in mental status in a little bit over a week." (T. 1261).  Her "decompensation" was due to a decrease in her Depakote,[15] the death of her mother, caring for her father, who had dementia, trying to seek full-time employment, and attempting to purchase a house. (T. 1267).

This case is distinguishable from cases such as *Martinez v. Saul*, No. 3:19-CV-1017 (TOF), 2020 WL 6440950, at *6-7 (D. Conn. Nov. 3, 2020), in which the court held that the lack of mental health treatment evidence for a substantial period from plaintiff's treating counselors created an "obvious gap" that the ALJ should have filled, and that the failure to attempt to obtain the records was reversible error.  In *Martinez*, the court pointed out that the record was not extensive or voluminous, the ALJ did not explain how the other evidence in the record supported the RFC finding, and the records of her hospitalizations provided nothing but "raw" data. *Id.* at *7.  In addition, the court held that the record did not show that the ALJ attempted to obtain any medical opinions in connection with the RFC determination. *Id.*

In this case, the ALJ had a substantial amount of evidence, both from physicians and from plaintiff's counselors at Arise, which discussed both raw medical evidence

---

[14] Dr. Leso was part of plaintiff's treatment team during her 2018 hospitalization.

[15] Depakote is a medication, used inter alia, "to treat manic episodes associated with bipolar disorder." https://www.depakote.com/

and plaintiff's abilities as discussed below.[16]  The ALJ did discuss whether there was any additional evidence, and plaintiff's counsel failed to obtain the records either at the hearing level or in his request for review by the Appeals Council. (T. 138-40) (request for review of ALJ's decision).   As discussed below, after the hearing, the ALJ consulted a medical expert, and explained how the existing medical evidence supported his decision.

In addition, given Dr. Leso's comments that the therapist at Circare found that in June of 2018, plaintiff was doing well and handling stress appropriately, it is likely that the absence of those records did not leave an "obvious gap" in the evidence.  Plaintiff did not begin treating at Circare until June of 2017, and plaintiff alleges disability beginning in 2008.  There is a substantial amount of medical evidence before her treatment at Circare began, including treatment notes from her 2018 hospitalization, which occurred during the time that she was treating with providers at Circare.  Thus, the ALJ did not err in failing to obtain the records.  The court may proceed to plaintiff's additional claims.

## 2.    Weight of the Evidence/Listing/RFC

Plaintiff argues that the ALJ failed to properly weigh the evidence submitted by his own expert consultant, Dr. Michael Lace, Psy. D., and that the ALJ "cherry-picked" from Dr. Lace's opinions. (Pl.'s Br. at 13-18).  Dr. Lace was contacted after the ALJ's hearing, and the ALJ sent him interrogatories to answer based on his review of the

---

[16] In *Martinez*, the court noted that the record was only 485 pages, only 123 of which were medical records.  2020 WL 6440950, at *7.  In this case, the record is 1305 pages long, of which 1,064 of them are medical records, and more that 180 of those are counseling records from Arise, which discuss plaintiff's condition over many years.

medical record, relating to plaintiff's mental residual functional capacity.  He did not examine the plaintiff.  After his review, Dr. Lace submitted two documents.  One was entitled "Medical Statement of Ability to Do Work-Related Activities (Mental)." (T. 1290-92). The second document was entitled " Mental Interrogatory - Mental Impairments - Adult." (T. 1294-98).

The first document appears to be a mental RFC evaluation.  In this evaluation Dr. Lace states that plaintiff has "mild" limitations in understanding, remembering, and carrying out simple instructions as well as a mild limitation in making judgments on "simple work-related decisions." (T. 1290).  Plaintiff had "moderate" limitations with respect to "complex" instructions, and complex work-related decisions. (*Id.*)  Dr. Lace also found that plaintiff had "moderate" limitations in interacting appropriately with the public, supervisors, and co-workers in addition to "moderate" limitations in responding appropriately to usual work situations and changes in a routine work setting. (T. 1291). In the answer to a separate question, Dr. Lace stated that plaintiff would have "moderate" limitations in concentration, persistence, and pace and in "***the ability to adapt or manage oneself***." (*Id.*) (emphasis added).

In order to meet the severity of Listings 12.03 and 12.04, plaintiff must meet either the A and B criteria of the Listing or A and C criteria of the Listing.  In order to meet the B criteria, the plaintiff would have to suffer either two "marked" limitations in four domains of functioning or an "extreme" limitation in one of the four domains: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1 ¶¶ 12.03(B), 12.04(B).

In order to meet the C criteria, the plaintiff's mental disorder must be "serious

and persistent;"[17] and there must be evidence of both

> (1) Medical treatment, mental health therapy, psychosocial
> support(s), or a highly structured setting(s) that is ongoing
> and that diminishes the symptoms and signs of your mental
> disorder; and

> (2) Marginal adjustment, that is, you have minimal capacity to
> adapt to changes in your environment or to demands that are
> not already part of your daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1 ¶¶ 12.03(C), 12.04(C).

After his review of the record, Dr. Lace found that plaintiff met the "A" criteria

of Listings 12.03 and 12.04, but did not meet the "B" criteria of either Listing. (T.

because plaintiff had only "moderate" limitations in concentration, persistence, and

pace and in "the ability to adapt or manage oneself." (T. 1291). However, Dr. Lace

found that plaintiff met the C criteria. (T. 1294, 1296-97). Dr. Lace checked boxes

adjacent to a statement of the C criteria listed above, including the statement that

plaintiff had marginal adjustment, which means that she had a minimal capacity to

adapt to changes in her environment or to demands that were not already part of her

daily life. (T. 1297). Dr. Lace explained this finding by stating that "multiple

hospitalizations suggest difficulty adapting and maintaining adequate functioning over

time. C-criteria are met." (T. 1294).

---

[17] Serious and persistent means that the individual must have a "medically documented history of the existence of the disorder over a period of at least 2 years." 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.03(C), 12.04(C).

"Cherry-picking" has been defined as "'inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source.'" *Pataro v. Berryhill*, No. 17-CV-6165 (JGK/BCM), 2019 WL 1244664, at *18 (S.D.N.Y. Mar. 1, 2019) (quoting *Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018)).  The ALJ was not "cherry-picking" from Dr. Lace's opinion.  He accepted Dr. Lace's finding that plaintiff would have at most "moderate" limitations in all of the domains of functioning, but found that the "C" criteria would not be met based on multiple reasons.  The ALJ did not "disregard" Dr. Lace's opinion regarding adaptability.  Instead, the ALJ cited it and articulated reasons for giving less weight to that opinion.  The ALJ's conclusion need not perfectly correspond with any of the opinions of medical sources cited in his decision as long as he has resolved the conflict and has considered the record as a whole. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

The ALJ disagreed with Dr. Lace's minimal adaptability finding for various reasons: (1) his finding that plaintiff had only "minimal capacity to adapt to changes in her environment" for purposes of the C criteria was inconsistent with his finding that plaintiff had only "moderate" limitations in the "ability to adapt or manage oneself" for purposes of the B criteria;[18] (2) although plaintiff had some psychiatric hospital admissions, most of them were "same day" discharges, and the more extended

---

[18] The court notes that Dr. Lace found only a "moderate" limitation in plaintiff's ability to "[r]espond appropriately to work situations and to changes in a routine work setting." (T. 1291). Responding to work situations and changes in a work setting appear to be related to the ability to "adapt."  If Dr. Lace believed that the plaintiff's hospitalizations detracted from that ability, then the VE's testimony, as discussed below, would account for those absences.

hospitalizations were years apart; (3) plaintiff lives in a house with her three children and performs most activities of daily living independently; and (4) she testified that she worked without problems for approximately one year prior to her most recent hospitalization, which was attributed to a reduction in her medication dosage, and the "extraordinary" stress of losing her mother, caring for her father who had dementia, looking for full-time work, and looking to purchase a house "all at the same time." (T. 14-15).  The ALJ also noted that no state agency psychological consultant or other acceptable medical source who is "designated to make equivalency findings," has determined that plaintiff meets a listed impairment. (T. 15).

In his analysis of step three of the sequential evaluation, the ALJ also considered that consultative psychologist Jeanne Shapiro, Ph.D., who examined plaintiff once[19] in December of 2016, found that plaintiff had "no" limitations in understanding and following simple directions, performing simple or complex tasks, maintaining attention and concentration for tasks, attending to a routine and maintaining a schedule, learning new tasks or making appropriate decisions. (T. 13).  Plaintiff had only "mild" limitations for interacting with others and handling stress. (T. 14).  It is true that Dr. Shapiro's examination was in late 2016, and Dr. Lace had the opportunity to consider an additional hospitalization from 2018, but Dr. Shapiro personally examined plaintiff and did consider two of plaintiff's hospitalizations.[20]  The ALJ also mentioned the

---

[19] As stated above, Dr. Lace did not examine the plaintiff.  He reviewed the medical records sent to him by the ALJ.

[20] It is not clear that Dr. Shapiro saw the records of the hospitalizations.  Dr. Shapiro also mentioned a 2014 "hospitalization" in "Rochester," but it does not appear that any such records are in the transcript or that there was a hospitalization in 2014. (T. 951).  The "Rochester" hospitalization,

"state agency psychologist" who reviewed the plaintiff's record, but noted that he was using an outdated version of the listings, making two of the functional categories "obsolete." (T. 14).

Thus, the "inconsistency" in Dr. Lace's opinion was not the only reason that the ALJ found plaintiff failed to meet the C criteria of the two listed impairments. Although not relevant to whether plaintiff met a listed impairment,[21] the court's review of the record also shows that the ALJ's comment regarding the plaintiff's hospitalizations appears to relate directly to a question that he asked the VE. (*See* T. 57-58). The ALJ asked the VE whether an employee could be "there" every day for eleven months and then be "gone" for three weeks.[22] The VE specifically stated that such an absence would not prevent full-time employment because the absence would "fall into a more short-term disability situation." (T. 57). In fact, the VE testified that an employer would tolerate up to two such absences per year, but it would be an "issue" if it began to happen "on a repeated basis." (T. 57-58).

While Dr. Lace was using the "hospitalizations" to comment on plaintiff's ability to "adapt" at step three, the ALJ also found that hospitalizations occurring "years" apart would not affect the plaintiff's ability to maintain full-time employment at step four of

---

which is also the "Newark" hospitalization occurred in August of 2016. (T. 438-69, 572-707). The name of the facility was "Rochester Regional Health," "Newark Wayne Hospital" in "Newark, New York." (T. 438). There are two sets of records associated with this hospital admission, but it is clear that they are essentially duplicates. (T. 438-69, 572-707).

[21] Plaintiff's multiple hospitalizations were also relevant to her RFC, which the ALJ discussed at step four of the sequential evaluation.

[22] Presumably, the ALJ was referring to plaintiff's potential hospitalization or other effect of her mental impairment.

the evaluation.  The inconsistency in Dr. Lace's report, together with Dr. Shapiro's

consultative report, plaintiff's work "history," her infrequent "extended

hospitalizations," her daily activities, and the lack of a state agency consultant's finding

that a listing was met,[23] together with the ALJ's review of the rest of the record

evidence was sufficient to find that a listed impairment was not met and for the ALJ to

proceed to step four of the sequential evaluation.[24]  This court finds that the ALJ's

listing analysis is supported by substantial evidence.

The ALJ moved on to a determination of plaintiff's RFC, giving due weight to

the MSSs of record.  The ALJ considered the functional evaluations written by Drs.

Shapiro, Lace, and State Agency Consultant Harding, giving them all "some weight."

(T. 16-17).  The ALJ pointed out that Dr. Lace found only "mild" limitations in

plaintiff's abilities to understand, remember, and carry out simple instructions and make

judgments on simple work related decisions, giving that opinion "some weight." (T. 17,

1290).  The ALJ gave "less weight" to the March 2, 2017 MSS submitted by plaintiff's

social worker at the time, Kelly O'Brien, who found that plaintiff would have "marked"

---

[23] The court puts less emphasis on this finding because Dr. Lace was specifically asked by the ALJ to determine whether plaintiff met a listed impairment.  The ALJ must have been referring to the "state agency" medical consultants who review an applicant's file on initial review such as Dr. T. Harding. (T. 61-73).

[24] The court also notes that the ALJ asked plaintiff's brother whether he had heard of plaintiff having any problems at her job while she was working in 2017, with her "attendance or anything like that," even though she was caring for her sick mother during that time. (T. 53-54).  Plaintiff's brother, who also testified that he checked up on the plaintiff frequently, stated that he was not "aware of" any problems with plaintiff's job during the time she was working. (*Id.*)  The ALJ did not specifically mention this fact in his decision, but in his analysis at step four, stated that he gave the brother's testimony "some weight," but only to the extent that the testimony was "consistent with the rest of the record." (T. 17).

26

restrictions in her ability to handle work stress and function independently, and a "marked" restriction in her ability to deal with "complex" instructions and "complex" work-related decisions and relating "predictably" in social situations.[25] (T. 17, 1271-76). Counselor O'Brien also found that plaintiff was incapable of even "low stress" work, would be "off task" 25% of the time and would be absent more than four days per month.[26] (T. 1274).

The ALJ stated that Counselor O'Brien's the MSS was not supported by an explanation, in some cases speculative, inconsistent with the plaintiff's activities, most of her mental status examinations, and the other opinion evidence of record. (T. 17). Dr. Lace did not comment on plaintiff's attendance and her ability to remain on task. A review of the many contemporaneous treatment notes supports the ALJ's findings. In 2013, plaintiff was dealing with issues regarding the custody of her children, and was stressed due to court appearances. (T. 787). On May 21, 2013, Psychiatrist Anwarul Karim, M.D. stated that plaintiff reported that she was stressed about her court appointment, but was doing "relatively better." (T. 787). Plaintiff had fair ADLs,[27] good eye contact, and her thoughts were "grossly organized." (*Id.*) She still felt stressed out and depressed "at times," and her affect was constricted, but she was not suicidal or paranoid, and her insight and judgment were "fair." (*Id.*)

---

[25] Dr. Lace found only "moderate" restrictions in dealing with "complex" instructions and work-related decisions, in interacting with the public, supervisors, and co-workers, and responding appropriately to usual work situations and changes in a routine work setting. (T. 1290-91).

[26] Counselor O'Brien was the only provider to specifically assess plaintiff's ability to be "on task" or address her potential absences.

[27] ADL stands for "Activities of daily living."

On November 16, 2013, Dr. Karim reported that plaintiff was calm, cooperative, and appropriate. (T. 794). The doctor stated that she was at "baseline." She had a job interview, was called back for a second interview, and was really hoping to get the job. (*Id.*) She felt as if she could finally do something for herself. (*Id.*) At that time she denied being depressed. (*Id.*) In February of 2014, plaintiff was very anxious about missing one of her medications, although she did not have any withdrawal symptoms, and "was doing very well otherwise." (T. 798). She had recently started to do some volunteer work twice per week and "liked" it. She felt confident that eventually she would be able to work. (*Id.*) In October of 2014, Dr. Karim stated that plaintiff was "doing well." (T. 801). He also stated that plaintiff reported that she was "doing fine" with her symptoms of anxiety and depression, but was frustrated because she could not find a job. (*Id.*)

In October of 2014, plaintiff's social worker Amy Case reported that plaintiff was feeling some depression because she could not find a job, but was reapplying and found that the busy schedule helped distract her from her anxiety and depression. (T. 714). There was great improvement by "reported" reduction in symptoms. (T. 714). In April of 2015, plaintiff's condition was listed as "continued with improvement." (T. 719). She was feeling more depressed because she lost her job at a supermarket, where she worked at the deli counter, but wanted to find a new job. (T. 720). She attributed her increased depression to the loss of her job and wished to find another. (T. 720). The clinician noted that plaintiff was struggling to balance her job, her appointments, and her children, but before she lost the job, she "was coping well with the transition."

28

(*Id.*)

On November 14, 2014, Nurse Practitioner[28] ("NP") Jane Miller reported that plaintiff was doing well, with no psychosis or racing thoughts. (T. 803).  She had no side effects from her medications, she felt "good," and she was sleeping better. (T. 803).  Plaintiff reported that she was not having any anxiety or depression as long as she took her medications. (*Id.*)  Plaintiff's insight and judgment were fair.  In December of 2014, plaintiff reported to Nurse Miller that her mood, sleep, appetite, energy, interest, and concentration were all "positive." (T. 809).  Plaintiff stated that she had no difficulty with her memory, recent or remote. (T. 808).  A very similar report was written in January of 2015. (T. 815).

In February of 2015, plaintiff's counseling report stated that she was back to work once per week, and she was looking for more work, with "no luck." (T. 820).  Her mood was stable, and she reported no problems with concentration or sleep. (*Id.*)  On March 26, 2015, plaintiff was seen for "medication management and evaluation." (T. 827).  She again presented with stable mood, and she had no problems with sleep, memory or concentration. (T. 827).  Nurse Miller wrote "[plaintiff] is stable, no psychosis and sent a note to her boss to clarify she is ready to go back to work without any difficulties." (*Id.*)

In July of 2015, Nurse Miller reported similar status and noted that plaintiff had not yet found work, "but does not seem to be a worried about [sic] as she has been in the past." (T. 839).  Plaintiff was taking her medication as prescribed.  Her mood was

---

[28] Although it is unclear, it appears that Jane Miller was a nurse practitioner.  Her credentials are listed with an "RN" license, but the initials "NP" are underneath it. (T. 807).

stable, and she reported no problems with memory or concentration. (*Id.*)  Her insight and judgment were "fair." (*Id.*)  Nurse Miller made the same findings on August 20, 2015. (T. 850).  Each time, Nurse Miller noted that plaintiff would continue to see her therapist, Amy Case. (T. 828, 834, 840, 846, 852).  Nurse Miller made similar reports on September 21, 2015, October 26, 2015, November 30, 2015, and January 25, 2016, at which time, Nurse Miller also noted that plaintiff began to see a new therapist, Kelly O'Brien, LMSW. (T. 856, 863, 868, 875, 876).

On April 21, 2016, plaintiff was seen by her new psychiatrist, Dr. Golam Mohiuddin, M.D. (T. 881).  She told the doctor that she was depressed and complained of anxiety.[29] (*Id.*)  Plaintiff was taking Ambien for sleep, and complained of paranoia "off and on." (*Id.*)  Plaintiff had history of cutting herself, but had not done that for the past 6 years, and her last hospitalization was "5 to 6 years ago at Hutchings." (*Id.*)  Dr. Mohiuddin noted that "[plaintiff's] medical symptoms were under control with the current medications." (*Id.*)  His examination showed that plaintiff was alert, fully oriented, had good eye contact, no psychomotor agitation or retardation, her mood was euthymic, her affect was congruent to her mood, her thought content was free of delusions, she denied any auditory or visual hallucinations, and had good impulse control during the session. (*Id.*)

On May 26, 2016, plaintiff told Dr. Mohiuddin that she was "doing better than

---

[29] The court notes that on February 24, 2016, she was seen by Physician's Assistant ("PA") Donald Penree, Jr. at Upstate University Hospital, who found her "psychiatric" status to be "normal," and at the end of his report stated that her "Depression/Anxiety" were "stable" and "followed by "Primary Care." (T. 1011, 1014).  Although plaintiff also was being followed by her counselors and psychiatrist at Arise, the court cites this statement solely to emphasize that plaintiff had significant periods of time in which she was not exhibiting acute symptoms.

before," and she had less bad dreams and nightmares. (T. 882).  Plaintiff lived with her parents and was taking care of her father, who had dementia, but was also busy with her children. (*Id.*)  Dr. Mohiuddin adjusted some of the plaintiff's medications, but his examination was similar to his April 2016 notes, including a finding of euthymic mood, no form of thought disorder, and good impulse control. (*Id.*)  He continued to encourage plaintiff to "see her therapist for support and behavioral management." (*Id.*)

On June 30, 2016, in addition to findings similar to his May 2016 report, Dr. Mohiuddin stated that plaintiff was about to start a 40-hour per week job as a dishwasher, noting that plaintiff told him that she could "handle the job." (T. 883).  He adjusted her medications, and also noted that she was still living with her parents, taking care of her father, and caring for her children. (*Id.*)  In July of 2016, Counselor O'Brien stated that plaintiff continued to struggle, but she was offered another job, which assisted in decreasing her symptoms of anxiety. (T. 735).

Dr. Mohiuddin's next report was written on September 8, 2016, after plaintiff's three-week, 2016 hospitalization, which occurred after she told her therapist that she was going to walk in front of a car. (T. 885).  The plaintiff told Dr. Mohiuddin that she had "too many stressors," including her loss of employment and her husband failing to provide enough money for child support.[30] (*Id.*)  She also cited her responsibility for

---

[30] The notes from plaintiff's 2016 hospitalization include a statement by Social Worker Jacqueline Pulsifer, BSW, who stated that she interviewed plaintiff's mother who told her that this was plaintiff's first hospitalization in "nine" years. (T. 520).  Plaintiff's mother also stated that "recent" stressors had pushed her daughter "over the edge." (*Id.*)  These stressors included child support being drastically reduced, seeing her ex-husband in court with his new wife, and starting a new job. Plaintiff's mother stated that "'[f]or some reason, she stopped taking her medications and ended up in the hospital.'" (*Id.*)

taking care of her father. (*Id.*)  Dr. Mohiuddin adjusted the dosage of one of plaintiff's medications because he thought it was too high. (*Id.*)  Plaintiff told the doctor that she lost her health insurance, but she had Medicaid.[31]  She was looking for a job even though she had been diagnosed with carpal tunnel syndrome.[32]  Finally, notwithstanding "suicidal thoughts," plaintiff told the doctor that she had no intention of killing herself, and she was safe to go home. (*Id.*)  Dr. Mohiuddin's objective findings were that plaintiff was fully oriented, her mood was euthymic, her affect was congruent to her mood, her speech was fluent, she had no form of thought disorder, she was free of delusions, had no suicidal or homicidal intent, and had good impulse control during the session. (*Id.*)

Plaintiff continued to see Dr. Mohiuddin.  On October 6, 2016, he noted that plaintiff was taking an "Abilify maintainer,"[33] which was prescribed in September of 2016.[34] (T. 887).  Dr. Mohiuddin discontinued several of the medications that plaintiff was receiving upon her discharge from the hospital in an effort to "straighten out her medication and try to simplify her regime." (*Id.*)  Dr. Mohiuddin found on examination that plaintiff's mood was euthymic, and her affect congruent with that mood, there was

---

[31] She told the doctor that her mother did not want her to be on Medicaid. (T. 885).

[32] There are no issues with any of plaintiff's physical impairments in this case.

[33] Plaintiff was actually receiving Abilify Maintena, not "maintainer," which is a drug used to treat schizophrenia and bipolar disorder. https://www.abilifymaintena.com/

[34] The Abilify Maintena was an injection that plaintiff would continue to receive once per month at the Comprehensive Psychiatric Emergency Program at St. Joseph's Hospital ("CPEP") (https://www.sjhsyr.org/find-a-service-or-specialty/behavioral-health/comprehensive-psychiatric-emergency-program-cpep). (T. 887).  The difference between Abilify and Abilify Maintena is that the Abilify is a pill taken daily, while the "Maintena" is the monthly injection that plaintiff was receiving. https://www.drugs.com/medical-answers/difference-between-abilify-abilify-maintena-3553316/

no thought disorder, and she was free of delusions, but stated that she was "hearing" her mother's voice. (*Id.*)  The doctors stated that "[s]he thinks she can handle the voices," and she had good impulse control throughout the session. (*Id.*)  Dr. Mohiuddin increased plaintiff's appointments to once per week in order to monitor her progress. (*Id.*)  She saw Dr. Mohiuddin on October 13 and October 20, with similar examination results. (T. 888, 889).  On October 13th, plaintiff denied any hallucinations, either auditory or visual (T. 888), and on October 20th, Dr. Mohiuddin noted that plaintiff's psychosis had improved. (T. 889).  Plaintiff's consultative examination with Dr. Shapiro took place in December of 2016. (T. 951-55).

Plaintiff's records during 2017 reflect more of the same type of assessment.  On February 7, 2017, plaintiff was seen by NP Julie Andrews for her Abilify Maintena shot. (T. 1168).  NP Andrews stated that plaintiff denied any psychotic symptoms along with "adamantly denying any suicidal or homicidal ideation, intent, or plan." (*Id.*)  On March 10, 2017, when plaintiff went to get her shot, she reported that she was doing well and had no complaints. (T. 1177).  There was no evidence of any thought disorder. (*Id.*)  Her "degree of incapacity" was listed as "mild." (T. 1178).  Her psychiatric exam was generally normal.[35] (T. 1181-82).  Her memory was intact, and her concentration and attention were "good." (T. 1182).  Her mood was "good," and her affect was "full." (*Id.*)

When plaintiff went for her April 2017 Abilify Maintena injection, plaintiff

---

[35] The report indicates that it was created by NP Andrews, but it was co-signed by Lucy Kollori, M.D., who stated in her "attestation" that she "personally" evaluated the patient and that "I agree with NP note." (T. 1177).

reported that she was doing well and had just started a part-time job.[36] (T. 1186).  There was no evidence of thought disturbance, and her mood and affect were appropriate. (T. 1186-87).  Her "degree of incapacity" was again rated as mild, and her psychiatric examination was generally normal, including her memory, cognition, attention, and concentration. (T. 1187, 1190-91).  On May 12, 2017, plaintiff reported that she was doing well and enjoying her part-time job. (T. 1195).  Her mood and affect were appropriate, her "degree of incapacity" was "mild," and her psychiatric evaluation was as before. (T. 1196, 1199-1200).  On June 13, 2017, plaintiff reported that the medication was working well, and she had no side effects. (T. 1204).  Plaintiff reported that she was having additional stress after hearing of her mother's medical diagnosis. She also reported that she began attending Circare for her counseling and psychiatric care. (T. 1205).  The plaintiff's degree of "incapacity" is again listed as "mild," and her psychiatric examination was generally normal. (T. 1205, 1209).

There is no question that when plaintiff has been hospitalized for an extended period, her symptoms have been severe.  However, the ALJ was presented with a substantial amount of evidence, indicating that, while plaintiff was moderately limited in her domains of functioning, she could also maintain her abilities for substantial periods of time.  The ALJ's finding that plaintiff's hospitalizations were years apart[37] is

---

[36] This report was co-signed by Archana Kathpal, M.D., who stated that she agreed with the assessment and approved the injection. (T. 1186).

[37] Plaintiff agrees that the hospitalizations were years apart, although in 2011 and 2016, there were two hospitalizations separated by a short period of time.  In 2011, plaintiff was discharged after her first admission, but stopped taking her medications, and according the discharge record from the second admission in April of 2011, she was hospitalized after the first discharge because she stopped taking her medications. (T. 241, 248).  There is no record of the first hospitalization from 2011.

supported by substantial evidence in the record, and the ALJ was presented with the VE's testimony regarding the effect of infrequent extended hospitalizations.  The court also notes that there is also substantial evidence supporting the finding that plaintiff's hospitalizations have been caused by extraordinary stress and medication fluctuations since she worked for extended periods of time without any stated problems.  Thus, the ALJ considered and weighed all the conflicting evidence in determining plaintiff's RFC.

### 3.    Evaluation of Symptoms

Plaintiff argues that the ALJ erred in finding that plaintiff's statements were inconsistent with the evidence. (Pl.'s Br. at 19-20).  For many of the same reasons cited above, this court disagrees with plaintiff.  While the ALJ may not have numbered the factors specifically, he did state his reasons for this finding.  Daily activities are specifically included in these factors. *See Medina v. Comm'r of Soc.* Sec., No. 20-708-CV, slip op. at 3 (2d Cir. Dec. Dec. 18, 2020) (allowing ALJ to consider daily activities in determining consistency with alleged symptoms); Roland *M. v. Saul*, No. 8:19-CV-1624 (MAD), 2020 WL 7356716, at *4-5 (N.D.N.Y. Dec. 15, 2020).  Daily activities may include the plaintiff's ability to perform work-related functions even though they do not rise to the level of substantial gainful activity. *Rivers v. Astrue*, 280 F. App'x 20, 23 (2d Cir. 2008). *See also Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (ALJ may reject plaintiff's subjective allegations in light of inconsistent evidence of daily functional ability.); *Wolfe v. Comm'r of Soc. Sec.*, 272 F. App'x 21, 22 (2d Cir. 2008) (ALJ properly discounted claimant's credibility based on her statements that she

attended church, shopped, and attended weekly football games); *Donnelly v. Barnhart*, 105 F. App'x 306, 308 (2d Cir. 2004) (ALJ properly discounted credibility based on statements that claimant cooked dinner, folded clothes, and sewed).

Plaintiff argues that her daily activities and her attempts at work show that she cannot maintain employment. The ALJ did not ignore plaintiff's activities, but found that plaintiff was not as limited as she alleges based, in part, on these activities. The ALJ found that plaintiff's hospitalizations were not based on the stress caused by her work activities alone, but based on many factors, including her medication levels as well as extraordinary stress at home.[38] The ALJ discussed plaintiff's daily activities including performing all self-care tasks, working part-time as a cashier,[39] taking care of her children, watching television, using the computer, and reading books, even though her brother was now assisting her with finances. (T. 16). In addition, the ALJ accommodated plaintiff's "moderate" restrictions in dealing with stress and changes in the work environment (ability to adapt) by including a limitation a "stable unchanging work environment," and limiting plaintiff to "simple tasks," avoiding work requiring more complex interaction with others, and limiting plaintiff to "simple decisions," relating to the completion of her tasks. (T. 15).

---

[38] As stated above, plaintiff's statements to her counselors that she felt better when she was working are also indicative of plaintiff's ability to maintain employment as long as she maintained the appropriate levels of medication and her family situation was under control.

[39] At the hearing, plaintiff testified that she had no problem working the cash register, because it "told" you what you had to know. (T. 46).

## VII.  <u>VOCATIONAL TESTIMONY</u>

### A.   Legal Standards

The Social Security Rulings provide that

> Occupational evidence provided by a VE . . . generally should
> be consistent with the occupational information supplied by
> the DOT. When there is an apparent unresolved conflict
> between VE . . . evidence and the DOT, the [ALJ] must elicit
> a reasonable explanation for the conflict before relying on the
> VE . . . evidence to support a determination or decision about
> whether the claimant is disabled. At the hearings level, as part
> of the [ALJ]'s duty to fully develop the record, the [ALJ] will
> inquire, on the record, as to whether or not there is such
> consistency.

> Neither the DOT nor the VE . . . evidence automatically
> 'trumps' when there is a conflict. The [ALJ] must resolve the
> conflict by determining if the explanation given by the VE . . .
> is reasonable and provides a basis for relying on the VE . . .
> testimony rather than on the DOT information.

S.S.R. 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). *See Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 446 (2d Cir. 2012) (the VE must provide a reasonable explanation for the conflict).  The ALJ must identify and resolve any conflict between the VE's testimony and the DOT before the ALJ relies on the VE's evidence. *Marjanovic v. Comm'r of Soc. Sec.*, No. 19-CV-246 (FPG), 2020 WL 3445676, at *3 (W.D.N.Y. June 24, 2020) (citing *Patti v. Colvin*, No. 13-CV-1123, 2015 WL 114046, at *6 (W.D.N.Y. Jan. 8, 2015)).

### B.   Analysis

In this case, plaintiff argues that the ALJ did not ask the VE whether his testimony conflicted with the DOT, and then the ALJ himself determined that there was

no conflict. (Pl.'s Br. at 21-22). Plaintiff's brief cites "potential" conflicts and then discusses the VE's testimony that, based on his experience, an employer would tolerate someone who was off task 10% of the day, but that an individual who is "off task" 33% of the day would be unemployable. (*Id.*)

While the Commissioner concedes that the ALJ did not ask the VE whether his testimony "conflicted" with the DOT, the defendant argues that any error was harmless because there was no conflict in the VE's testimony. (Def.'s Br. at 19) (citing *Salati v. Saul*, 415 F. Supp. 3d 433, 449 (S.D.N.Y. 2019)). This court agrees. First, the ALJ did not include any time off-task in his RFC. There was a discussion of being "on task" at the hearing, initiated by the ALJ. (T. 56-58). Plaintiff's counsel questioned the VE further on the topic (T. 58-60), and the VE testified that his opinion about employer tolerances came from his "experience and literature on the topic," not the DOT.[40] (T. 57).

The only specific opinion regarding plaintiff's ability to be "on task" came from plaintiff's social worker Kelly O'Brien, an opinion that the ALJ specifically and properly gave little weight. The record evidence of plaintiff's attention and concentration, as stated above, was often that both were "intact,"[41] and the ALJ discussed the issue properly. Thus, plaintiff does not establish plaintiff's attention or ability to be on task as a "conflict" between the VE's testimony and the DOT.

---

[40] The DOT does define terms such as "frequently." (T. 58).

[41] Dr. Shapiro stated that plaintiff had no limitations maintaining attention and concentration for tasks. (T. 953, 954). Even Dr. Lace found that plaintiff had "mild" restrictions in understanding, remembering and carrying out "simple" instructions, and she only had a "moderate" limitation in concentrating, persisting, or maintaining pace. (T. 1290, 1295).

Plaintiff does not specify how the VE's testimony otherwise conflicted with the DOT. "[Vocational] expert testimony and the DOT conflict where they disagree in categorizing or describing the requirements of a job as it is performed in the national economy." *Schmitt v. Astrue*, No. 5:11-CV-0796 (LEK/ATB), 2012 WL 4853067, at *3 (N.D.N.Y. Oct. 11, 2012) (alterations in original) (quoting *Martin v. Comm'r of Soc. Sec.*, No. 5:06-CV-720, 2008 WL 4793717, at *2 (N.D.N.Y. Oct. 30, 2008) (citing *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003)).  However, "[t]he DOT's mere failure to mention every single characteristic of [a plaintiff's] limitations in every job available for [him] does not constitute [an apparent conflict]." *Id.* (citing *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir.1995)).

An example of the type of conflict requiring remand occurred in *Lockwood v. Comm'r of Soc. Sec.*, 914 F.3d 87 (2d Cir. 2019).  In *Lockwood*, the ALJ included a restriction on overhead reaching in the RFC.  The VE testified to available jobs that, according to the DOT, all required "frequent reaching." *Id.*  However, because "reaching" was defined by agency policy as reaching "in any direction," this created a "potential conflict" between the VE's testimony and the DOT which required remand for resolution. *Id.*

In this case plaintiff does not cite to specific potential conflicts.  Instead, plaintiff argues that, because the ALJ did not ask the VE whether there were any conflicts, this automatically raised potential conflicts.  However, as stated above, the ALJ's failure to inquire, if there are no conflicts cited, is harmless and is not a basis for remand.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is further

**ORDERED**, that judgment be entered for the **DEFENDANT**.

Dated:  December 21, 2020

Andrew T. Baxter
U.S. Magistrate Judge